J. Daniel Fink, J.
The 1957 Legislature enacted a provision relating to motor vehicles. It became effective on July 1, 19581 as subdivision (a) of section 1210 of the Vehicle and Traffic Law (L. 1957, ch. 698, § 4). It reads as follows: “ No person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, removing the key, and effectively setting the brake thereon and, when standing upon any grade, turning the front wheels to the curb or side of the highway.” It becomes necessary to decide its application to the facts and motions before me.
It is a case of initial impression, as far as research by the court and counsel discloses. The path must therefore be set toward the result the enactment was intended to achieve.
The facts, disputed only in several minor details, are simple and uncomplicated. However, they indicate that in the complexity of modern conditions the simple can become the involved, and thus lead to controversy which neither party wanted or anticipated. This is what happened:
After midnight, in the early morning hours of December 14,, 1958, the defendant, who had attended a function in Eego Park,, left to get his automobile which he had parked about a block and a half from the building in which the function was held. He drove his automobile back to the building intending to pick up his friend who was waiting for him. The building fronted on Queens Boulevard which has a vehicular service lane immediately adjacent to the sidewalk curb. The defendant tells the balance of his story in his own words:
‘ ‘ I could not see my friend as I pulled up to the entrance, and I therefore double-parked the car and remained inside, expecting him to come out of the building at any moment.
*520 14 My friend came out of the building, but evidently did not see me. I, therefore, slid out of the right side of my car and motioned to him. I left the right hand door of my car open, and, as I motioned to my friend, I was standing between my car and the car next to which I had double-parked. At that precise moment, I was pushed forward by someone who came up behind me and who I did not see. I was knocked forward and by the time I had recovered, my car was already in motion going down the street. I immediately gave chase, together with my friend, and a third person who attempted to follow my car in another vehicle.”
What happened next gives rise to this lawsuit. The defendant’s unknown and disappearing assailant, after knocking him down, jumped into the automobile and drove it down the service road, running into and damaging several parked automobiles, one of which was the plaintiff’s, to his claimed damage of $896.21. The plaintiff alleges that defendant was negligent for having left his automobile unattended with the motor running in violation of the section of the Vehicle and Traffic Law above quoted. There is, of course, no question here involved of plaintiff’s contribution to the negligence, if there be any negligence at all.
Defendant answered the complaint by denying that he was operating or controlling his automobile when the accident happened or that he left it unattended with the motor running. He seems truthfully to have corroborated such allegations in defense during his examination before trial which ensued the joinder of issue. The most salient portions thereof follow: 4 4 Question 21: What did you do at that time ? Answer: Stopped the vehicle and opened the door on the passenger side, stepped from the vehicle and motioned to my friend to come. Question 22: Did you leave the vehicle, did you step out of the vehicle at that time? Answer: Yes. Question 23: Did you close the door on the right hand side, which is not the driver’s side? Answer: No. Question 25: When you stopped the vehicle, did you turn off the motor and remove the key from the ignition? Answer: The key was in the ignition. Question 26: Was the motor running? Answer: I can’t give you yes or no answer on that, in fact it’s more apt to be no. Question 31: And when you left the vehicle you had your parking lights on? Answer: Yes. As I pulled up, I sat in the vehicle a minute or so, evidently my friend did not see me and that was why I stepped out of the car to call his attention. Question 32: When you pulled up to the Jewish Center approximately at 12:20 a.m. on *521 December 14, 1958, were there any people gathered in front of the center? Answer: There were people, many people in fact. Question 33: And there were other cars double parked? Answer: I don’t know, there were none in front of me. Question 36: When you stepped from the car to motion to your friend, did you at any time remove your hand and your entire body from the vehicle? Answer: Yes. Question 37: Did you step onto the sidewalk in front of the Center to motion to your friend? Answer: No. Question 38: When you stopped your vehicle in front of the Jewish Center, at this time, was there another vehicle which parked alongside the curb, parallel and directly alongside of where you stopped your vehicle? Answer: There was a vehicle there, but I had ample space to open the door. Question 39: When you motioned to your friend, did you step between two parked vehicles to motion to him? Answer: I was at the tip of the front left fender of a Volkswagen.”
Based upon the alleged admissions in the questions and answers numbers 22 and 25 above and the police blotter report which describes defendant’s automobile as having been parked ‘ ‘ with its motor running when an unknown male got in and drove off and * * * struck” plaintiff’s auto, the operator of the defendant’s car having “ escaped on foot”, plaintiff moved for summary judgment. He claims that ‘ ‘ the defendant failed to comply with the statute cited, thereby constituting negligence as a matter of law ” leaving only the question of the damages to be assessed.
The defendant insisted that his actions cannot be interpreted to mean that he left his ‘ ‘ vehicle unattended at any time during the happening of the events ”. He emphasizes his passivity in these events by saying: “ I never left my vehicle, I merely stepped out to motion to a friend, whereupon I was assaulted and the vehicle stolen from me * # * he or they, drove my car without my consent, and in fact, against my express and implied wishes.” He objects, too, to the weight plaintiff gives to the report of the police blotter since the document does not indicate whether the officer who made the report was present as a witness to the occurrence.
With the latter objection, the court agrees. There is nothing presented to insure any appreciable probative force to the police blotter as original testimony. The extract from the police blotter report quoted by the plaintiff is silent as to whether the reporting police officer actually witnessed the occurrence, or .based his findings on information supplied by others. The court may not resort to speculation or conjecture, and give credence *522 to hearsay. (Johnson v. Lutz, 253 N. Y. 124; Trbovich v. Burke, 234 App. Div. 384; Needle v. New York Rys. Corp., 227 App. Div. 276.)
The defendant, believing no more in the validity of plaintiff’s cause of action than plaintiff believed in the legal merit of the defense, cross-moved for summary judgment. He contends that the enactment, subdivision (a) of section 1210 of the Vehicle and Traffic Law, cannot be so distorted in meaning as plaintiff suggests. “Unattended”, says defendant, is “addressed to situations where the operator of a vehicle stops his car and leaves the immediate vicinity ’ ’ and is not to be applied in a situation like the one forming the basis of this lawsuit — urging that since there are no serious questions of fact, the complaint should be dismissed as a matter of law.
A few preliminary remarks should be able to clear the way to a fuller discussion of the merits of the opposing legal contentions.
• Almost 20 years ago — long before the summary judgment rule was expanded to encompass negligence actions within its applicability — Judge Bernard Shientag wrote: “ The presence of complicated questions of law does not operate to defeat summary judgment * * * If the law depends upon the existence of facts which are in dispute, summary judgment will be denied, not because of the complexity of the legal questions presented, but because of a triable issue of fact, which has to be determined before the law can be applied ” (Shientag, Summary Judgment, p. 48). He was prophetic, too, in anticipating that ‘ ‘ the remedy should be made available to a plaintiff and to a defendant alike in any type of civil action or proceeding ” (p.111).
And so here, the novelty of the invoked recent statute and the possible complications involved in eliciting its meaning and applicability to facts such as here presented are no deterrents to a summary judgment for either moving party; provided, however, no questions of fact remain for the decision of which either side is entitled to a trial. Nor is the fact that the complaint is bottomed in negligence an obstacle to summary judgment at this time (Bules Civ. Prac., rule 113, as amd.).
The ripening of the summary judgment statute into an all-purpose method of disposing with dispatch all civil litigation which would otherwise be prolonged, but without loss of substantial justice in the process, did not change the basic necessities of proof theretofore required. There is still the need for the court’s determination on motion as to whether there is a bona fide issue. Any substantial factual issue would effectively *523 defeat such a motion; and there is no difference as to that statement of established law, whether it is to be applied in a contract action or, as more recently permitted, in a tort action (Di Sabato v. Soffes, 9 A D 2d 297, wherein there is an elucidating discussion of the basic requirements of proof in a negligence action).
The application of this principle of proof and the existence or nonexistence of an issue in this case must first await the question of whether the statute, if violated by defendant under the facts here disclosed, give an absolute right of recovery to plaintiff, absent any factual dispute. Is the statute clear or ambiguous ? Is it the result of a legislative desire to prevent theft, or to promote safety, or both? Will a violation of the statute be negligence per se or only some proof of it?
The plaintiff is sanguine in his approach to these questions. He argues that the facts here disclose 1 ‘ the violation of a statute ” which “ constitutes negligence per se ”, citing Martin v. Herzog (228 N. Y. 164, 169) and Homin v. Cleveland & White-hill Co. (281 N. Y. 484, 487). The defendant, equally■ dependent upon such same precedent as the Martin v. Herzog case, is no less vehement in advancing Judge Cabdozo’s caveat: “We must be on our guard, however, against confusing the question of negligence with that of causal connection between the negligence and the injury ” (p. 170).
The problem here posed is not of simple solution. Is the act of violating this statute (assuming there is such violation here, as plaintiff asserts) by leaving the standing automobile unattended and the ignition switch with the key still inside, per se the neglect of a statutory duty so as to be the proximate cause of any ensuing damages, or must more than such mere violation, some further proof, be shown to augment the violation in order to pin a label of negligence on the misdoing defendant?
This new statutory provision has not heretofore been subjected to these inquiries in this State. Only one case has been found relating to this section which bears some small comment. It involves the violation of the statute, not in the aspect of a civil responsibility, but in its violation as a traffic infraction, subjecting the defendant to “penalties of a criminal nature, namely, fine, jail or both” (Vehicle and Traffic Law, § 1800). The City Court of Corning concluded that ‘ ‘ The most apparent objective, or intended effect, of the provisions at issue-is to curtail the theft of vehicles both by removing a temptation, and by making the theft more difficult”. The court further remarked that the ignition and key provisions “ are too remote as safety devices. They relate only to starting the car and not *524 to its manner of operation, and purport to protect the owner from the possible unlawful act of another”. The statute was held unconstitutional as a criminal statute on the ground that it was too vague and indefinite for enforcement. (People v. Hammond, 14 Misc 2d 607, 608, affd. 15 Misc 2d 724.)
While this is undoubtedly true to the extent stated, the delimiting appraisal of the statute’s applicability cannot influence the civil aspect which here requires more minute inspection of its purpose and meaning.
Because of the recent vintage of its genesis, the statute has had no other scrutiny by New York courts. As hereinafter appears, similar statutes having a longer history in other States have been subjected to testing, with far less uniform results than one would expect (Ann. 51 A. L. R. 2d 633). But first there must be exhausted the possible meaning of our statute intended by the Legislature. Toward that end we must ascribe to the Legislature a desire to effect a purposeful end by the language used (Erie County Water Auth. v. Kramer, 4 A D 2d 545, 550; Matter of Blatnicky v. Ciancimino, 1 A D 2d 383, 388; Matter of Smathers, 309 N. Y. 487, 495), and in so doing, its language should be given its ordinary meaning, the meaning which all of us give to the use of words, without distortion (Matter of Daniman v. Board of Educ. of City of N. Y., 306 N. Y. 532, 544, revd. on other grounds 350 IT. S. 551; People v. Pestronk, 3 Misc 2d 845, 846; Matter of Winters, 277 App. Div. 24, 26, affd. 302 N. Y. 666), in order to effect such end. To analyze the statute in that manner is to find the way to its intended meaning.
It is concluded that the purpose of the statute is twofold. It is indeed a deterrent to theft. It is also a safety device; for to lock the ignition, to remove the key and to set the brake, all result in preventing interference with the automobile’s stationary condition and mechanical immobility. It is protection to life and property which might otherwise be affected by improper movement of the automobile. And the Legislature’s own explanation of its purpose corroborates the clear intent derived from the very words of the statute itself.
Three years before subdivision (a) of section 1210 of the Vehicle and Traffic Law was enacted by the Legislature, its Joint Legislative Committee on Motor Vehicle Problems reported upon a recommended revision of the Vehicle and Traffic Law (N. Y. Legis. Doc., 1954, No. 36: “Modernization of the Vehicle and Traffic Law of the State of New York based on the Uniform Vehicle Code ”). Among the revised sections was an identically worded subdivision (a) of section 1210, then part of proposed article 22 and designated as subdivision (a) of sec *525 tion 280. The report would have similar value with respect to subdivision (a) of section 1210, since there is indication that the same motivation impelled the present law as that relating to the 1954 proposal. In part the report said of proposed subdivision (a) of section 280 (now § 1210, subd. [a]): “Subsection (a) of section 280 is designed to obviate the risk of a vehicle moving from the place where it was left parked and possibly injuring the person or property of others as well as itself being damaged. It serves to lessen the likelihood of theft ”. (N. Y. Leg. Doc., 1954, No. 36, p. 106.)
Prior to that proposed law drivers were not required by statute to lock the ignition and remove the key when leaving their vehicles standing unattended (Mann v. Parshall, 229 App. Div. 366).
As a precaution of safety, the legislative committee recommended the new section with language here pertinent: “ The requirement that the engine be stopped, the ignition locked and the key removed therefrom would be new. While such a precaution might not deter the professional thief, it may well be sufficient to deter youngsters intending to ‘ joyride ’. Children, furthermore, are notoriously prone to play on and around cars and, at a very early age, have a smattering of knowledge of how to start a car. The unlocked car with keys left in the ignition is, likely to seem an irresistible plaything to many children.” (N. Y. Legis. Doc., 1954, No. 36, p. 107.) It appears accordingly that the dominant purpose of the statute was a safety measure and its secondary purpose was an additional obstacle to theft.
In this there was commendable foresight. For the automobile had emerged as a necessary way of life, like electricity. It also carried with its wide use, some irresponsibility on the part of the users. And like the later compulsory insurance, some safeguards were beginning to evolve from adverse public experiences, included among which was the legislative proposal which became law four years later (§ 1210, subd. [a]).
Having assessed the legislative prime purpose and intent, did the statute, worded as it is, carry out that intent so as to be applicable in all alleged tortious instances, including the facts here presented? The over-all pattern having been established, the blueprint must be searched, piecemeal, to find the answer.
Prior to the enactment of the statute, one of the factors considered in determining whether there was negligence in related cases, was the length of time during which the vehicle was left “ standing ”. Thus the court in Lee v. Van Buren & N. Y. Bill Posting Co. (190 App. Div. 742) reversed the judgment of the *526 court below, which dismissed the plaintiff’s complaint, and ordered a new trial in order that the jury might determine whether the owner of an electric delivery truck was negligent in leaving it parked in front of its premises for a considerable period of time without securing the lever which connected the current to the motor, it appearing that the truck was started by a boy and caused the death of plaintiff’s decedent.
In Connell v. Berland (223 App. Div. 234, affd. 248 N. Y. 641) where the judgment of the court below for the plaintiff was affirmed, the defendant had, among other things, left the motor vehicle standing unattended in the street for more than a half hour, with the door unlocked and with the key in the ignition switch.
These cases, in which different results were obtained, indicate clearly that absent statutory direction or prohibition, the ultimate question of negligence is for the trier of the facts or the jury to determine.
In this regard, further light is shed on the legislative intent by again referring to the Joint Legislative Committee’s Report (supra). In its recommended “Definition of words and phrases ”, we find the then proposed subdivision 53 of section 100, now section 145 of the Vehicle and Traffic Law, reading as follows: ‘ ‘ Stand or standing. Means the stopping of a
vehicle, whether occupied or not, otherwise than temporarily for the purpose of and while actually engaged in receiving or discharging passengers.” (Emphasis supplied; N. Y. Legis. Doc., 1954, No. 36, p. 30.)
The emphasized words would seem to import that the driver or person in charge of a motor vehicle was to be completely away from the automobile, and that the automobile would have to be in that state for a reasonably long length of time, before the provisions of the statute would become applicable.
Apart from the word ‘ ‘ unattended ’ ’ the statute’s reference to the stopping of the engine, the locking of the ignition, the removal of the kéy and the effectively setting of the brakes, are not here germane. These terms are today so clear from their constant, daily use, that to interpolate them would indicate a disregard of the basic knowledge of the public.
Now, then, assuming (without presently analyzing the use of the word) the automobile here involved were to be considered as having been ‘1 unattended ’ ’ within the meaning of the statute, what effect would the statute have on whether there was an act of negligence on the part of the defendant, especially when there was the interference by a third party? As has been previously stated, no New York case has been found to be a *527 precedent. And the divergence of view in the approximately 40 States which have similar statutes leaves an inconsistency which is indecisive, also.
Some cases recognize the violation of the statute, by itself, as constituting negligence, for example Squires v. Brooks (44 D. C. App. 320); the result, but not the principle being overruled in Ross v. Hartman (139 F. 2d 14 [C. A., D. C.]); Ostergard v. Frisch (333 Ill. App. 359); but, see, later Illinois cases which hold such violation to be prima facie and not per se negligence; Cockrell v. Sullivan (344 Ill. App. 620); Ney v. Yellow Cab Co. (2 Ill. 2d 74); Maggiore v. Laundry & Dry Cleaning Service (150 So. 394 [La.]); Garbo v. Walker (57 Ohio Op. 363); Barlow v. Verrill (88 N. H. 25,).
Other eases lean to, the view that the violation of the statute is just evidence, but not conclusive, of negligence, for example, Malloy v. Newman (310 Mass. 269), overruled by Galbraith v. Levin (323 Mass. 255); Cockrell v. Sullivan (supra); Ney v. Yellow Cab Co. (supra).
It is unnecessary to cite further authority. It is sufficient to note that while the earlier cases were rather adamant in appraising the ordinance’s violation as constituting negligence per se, the more modern trend is a little less exacting. It appears that such a violation should be considered in the entire picture of negligence, as being only a part, and is to be evaluated in the light of the general doctrine of proximate cause, as Justice Cardozo cautioned in Martin v. Hersog (228 N. Y. 164, supra).
As above stated, the natural meaning and normal usage of the word should prevail, if possible, in an effort to reach the legislative intent in enacting subdivision (a) of section 1210.
The layman — the one who is subjected, if at all, to the application of the statute — must understand what is meant by “ unattended ”. It is the legal uninitiated and not the experienced lawyer who must interpret that word for himself. And the unabridged nontechnical dictionary is the best source for that meaning. Reference thereto discloses that the word 1 ‘ attend ’ ’ has many meanings.- But culling from them the ones most pertinent, we find that “attend” is defined as: To go with, or accompany; to be present, in pursuance of duty; to watch over or care for; to exercise attention; and to pay regard or heed; all of which the Legislature must have had in mind when the negative of that meaning — “unattended”—was used. It was intended (in the light of proximate cause) to embroil the nondoer in the prohibition of the statute and subject him to the civil and criminal penalties ensuing from his act, if *528 he left the automobile in his charge 1 ‘ unattended ’ ’ and did not do the other positive things demanded by the statute; thus setting the stage for some untoward happening.
In this case defendant’s automobile was standing unoccupied, but with the driver immediately beside it, having left the vehicle temporarily while awaiting a passenger; the engine was “ more apt” not to be running; and “ The key was in the ignition” (within the prohibition of the statute). The record is silent as to the setting of the brakes. Thus, if the automobile were left “ unattended ” as the result of the facts portrayed on this motion, there was a definite violation of the statute, namely, the key was not removed from the ignition.
The problem finally resolves itself into a question of whether the automobile was allowed to stand ‘ ‘ unattended ’ ’. For if it were so unattended, in the over-all picture of proximate cause between the act and the damage, a finding might be made of negligence. On the other hand, if the presence of the defendant under the circumstances did not deteriorate into lack of care or attention to the automobile, then the automobile stood “ attended ”, within the purview of the statute.
In Lustbader v. Trader’s Delivery Co. (193 Md. 433) the court was called upon to interpret the word “ unattended ” in a similar statute. It was held (p. 240): “A reasonable interpretation is that it means without anyone present who is competent to prevent any of the probable dangers to the public * * * The statute does not require a guarantee that a car cannot move or be moved to the damage of the public, but only that the reasonable precaution mentioned be taken. ’ ’ (Emphasis supplied.)
The affidavits submitted and the questions and answers elicited upon the examination before trial do not convince one that the facts disclosed can be decided on these cross motions for summary judgment one way or another so as to leave only a question of law to be decided. To do so upon the facts and the record here presented would be tantamount to holding the defendant to be an insurer of the public. If the triers of the facts, in the light of all other surrounding circumstances which may be developed at the trial, decide that there was attendance, then the statute does not apply and the ordinary rules of negligence will be the basis of their determination. And it may well be that the consideration of these rules is cogent on the very question of whether the car was “ unattended ”.
Was defendant liable to have foreseen the possibility of what happened and was he under the duty to guard against it, in this “unattended” situation? Or under ordinary circumstances *529 was he to have anticipated that as he stood outside the automobile with the door open and the engine shut off, he would have an assailant throw him to the ground, jump into the car, turn on the motor and drive off! All of these things as he stood in the contiguous proximity of his car with the door open at his elbow! There is also the possibility that defendant might have been equally ill-treated and the car made off with had he actually been sitting in the driver’s seat.
None of these matters can be resolved with satisfactory finality on these motions.
A pithy statement of this entire question is: ‘ ‘ The general rule is that when, between negligence and the occurrence of an injury, there intervenes a wilful, malicious, and criminal act of a third person which causes injury but was not intended by the negligent person and could not have been foreseen by him, the causal chain between the negligence and the accident is broken. On the other hand, if, at the time of the negligence, the criminal act might reasonably have been foreseen, the causal chain is not broken by the intervention of such act. And the surrounding circumstances, including the nature of the locality in which the negligence occurred, may be sufficient to render an intervening criminal act reasonably foreseeable within the meaning of the latter rule. In the application of these principles to the situation where a thief puts in motion a vehicle left on a public street and injury or damage ensues, a majority of the cases have taken the position that the act of the thief prevented a finding that the injury or damage was the proximate result of any prior negligence in the manner in which the vehicle was parked, or, at least, that the trier of the facts could legitimately come to that conclusion ” (Ann. 51 A. L. R. 2d 662-663). (See Tierney v. New York Dugan Bros., 288 N. Y. 16; Maloney v. Kaplan, 233 N. Y. 426; Lotito v. Kyriacus, 272 App. Div. 635, motion for leave to appeal dismissed 297 N. Y. 1027; 4 N. Y. Jur., § 333.)
Such cases as Gumbrell v. Clausen-Flanagan Brewery (199 App. Div. 778) cited by plaintiff, involving the anticipation of children’s interference with an unlocked parked car, are not applicable since we are here confronted with a time element, after midnight, when it may be safely said that the defendant could not have anticipated any children at play in the vicinity.
Nor can there be found, as plaintiff suggests, analogy in comparing an inanimate automobile with a “ spirited horse ” which can be frightened, thus causing damage (Maloney v. Kaplan, 233 N. Y. 426). An automobile cannot be scared in the same manner.
*530 The court is constrained, upon considering all the factors-involved in these cross motions for summary judgment, to the conclusion that on this record it cannot, as a matter of law, grant a summary judgment to either party. Both motions are therefore denied.